## DISTRIBUTION, REPAIR, AND RE-SALE AGREEMENT

This DISTRIBUTION, REPAIR, AND RE-SALE AGREEMENT ("Agreement") is entered into by and between American Fuel Cells and Coated Fabric Company with a principal place of business at 8600 North Central Freeway, Wichita Falls, TX 75305, a manufacture of aircraft fuel cells here after referred to as Amfuel and Aero Precision Industries LLC a distributor of aircraft parts, here after referred to as Distributor.  Amfuel and Distributor may be collectively referred to herein as a "Party" or the "Parties." This Agreement is entered into on the last date signed (the "Effective Date") and is valid for three years (the "Term").

### Article 1 Subject, Products and Territory

1.1 Amfuel hereby appoints Distributor and Distributor hereby accepts an exclusive appointment as Amfuel's Distributor for the marketing, distribution, selling of aircraft fuel cells for all military platforms (collectively the "Products"), within the territories covered in Attachment "A" (Commercial Terms) hereto ( the "Territories"). In addition to the Territories specified in Attachment A and whenever pre-approved in writing by Amfuel, the Distributor is granted permission to sell the Products in additional territories and/or additional aircraft platforms . Distributor shall act as an exclusive agent for other Amfuel products not listed herein in the Territories, so long as agreed to in writing by Amfuel.

1.1.1 The Distributor will provide the following services on behalf of Amfuel, in the Territories concerning the fuel cells that would be contained in the aircraft platforms described above, and any additional fuel cells or territory agreed to in writing by Amfuel. These services include, but are not limited to:
   a) Following up the evaluation of Distributor's proposals with the client(s) for the sake of protecting Amfuel's name and economic interests.
   b) Secure necessary information that will assist Amfuel in conducting its business in the Territories in a professional manner.
   c) Identifying available sales leads on an ongoing basis from the general market covered by Distributor. The Distributor will analyze, prioritize, and follow up on leads to develop business opportunities for Amfuel in the Territory and use its best efforts in making sales to individuals or entities in that Territory.

1.1.2 GENERAL RESPONSIBILTIES OFDISTRIBUTOR

The Parties acknowledge and agree that each Party is an independent contractor.  This Agreement does not create a joint venture or partnership between the Parties.  Amfuel and Distributor shall not be or be deemed partners, joint ventures, or the employees of one another. No Party, or their respective officers, directors, managers, employees, or agents, shall have any express or implied right or authority to assume or create any obligation on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any third party.  As an independent contractor Distributor agrees that under applicable Federal and State law, Amfuel will not:

i. Require Distributor to work exclusively for Amfuel;

ii. Establish a quality standard for Distributor, oversee the actual work or instruct Distributor as to how the work is to be performed, except the Parties agree that Distributor's services and products will be consistent with generally accepted industry standards for the Distributor's customary services and products;

Exhibit 1

iii.   Pay Distributor a salary or hourly rate, but rather will pay only the compensation as provided for in this Agreement;

iv.   Provide more than minimal training for Distributor;

v.   Provide tools or benefits to Distributor;

vi.   Dictate the time of performance, except that a completion schedule and a range of mutually agreeable work hours may be established through a written agreement mutually acceptable to both Parties for particular work Distributor accepts from Amfuel;

vii.   Pay Distributor individually if Distributor is an individual; instead, Amfuel will make all compensation checks payable to the trade or business name under which Distributor does business; or

viii.   Combine its business operations in any way with Distributor's business, but instead both Parties will maintain their own operations as separate and distinct.

### 1.1.3 DISTRIBUTOR OBLIGATIONS

Distributor hereby covenants, warrants, and agrees that it has obtained and holds any and all necessary licenses as may be required under applicable laws; and that Distributor has complied with all other requirements to qualify as an independent contractor under applicable State and Federal law. Consistent with the provisions of this paragraph, Distributor agrees not to use Amfuel's name in any advertisement, promotion, business card, etc., without Amfuel's prior written consent. Distributor further agrees not to advertise, promote or represent to any customer, potential customer, supplier or any other third party that Distributor is Amfuel's employee or agent. Instead, Distributor may represent that the Parties have an independent contractor relationship under which Distributor may from time to time be offered by and may accept from Amfuel an opportunity to sell Amfuel products through Distributor's customary services and products.

A.   DISTRIBUTOR shall use commercially reasonable efforts to market and sell the Products within the Territories. In addition, DISTRIBUTOR agrees to perform the following duties:

1.   Develop and implement marketing and action plans for sales programs in the Territories to be shared with Amfuel.

2.   Maintain and train personnel within agreed upon Territories as reasonably necessary to promote Amfuel's products utilizing best efforts.

3.   Support Distributor's customer requests for information related to Amfuel Products.

4.   Take all reasonable steps to maximize the sale of the Products in the Territories.

5.   Promote Amfuel Products at trade shows.

6.   Pay Amfuel's invoices in full 30 days (net) after the date thereof.

7. At Amfuel's request, Distributor will share detailed information regarding sales leads, marketing activities, sales personnel, and potential customers at either Parties' facilities. These meetings will be scheduled by Aero Precision and referred to as "Program Management Reviews" or "PMR".

1.1.4 Limits of Liability

TO THE MAXIMUM EXTENT PERMITED BY APPLICABLE LAW, NEITHER PARTY HERETO SHALL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOST REVENUES, LOST PROFIT, LOSS OF USE, OR LOSS OF BARGAIN, RESULTING FROM ITS PERFORMANCE OR ITS FAILURE TO PERFORM UNDER THIS AGREEMENT. IN NO EVENT SHALL DISTRIBUTOR'S LIABILITY FOR CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY IS LIMITED TO PER CLAIM EXCEED THE GREATER OF (I) THE AMOUNT OF PURCHASES OF THE PRODUCT SUBJECT TO THE CLAIM PROCURED IN THE PRIOR TWELVE (12) MONTHS FROM THE DATE OF THE CLAIM, OR (II) ONE (1) MILLION UNITED STATES DOLLARS ($1,000,000 USD). NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO REQUIRE AERO PRECISION TO INDEMNIFY SUPPLIER, OR OTHERWISE ASSUME RESPONSIBILITY FOR ANY ACTS OR OMISSIONS OF AN AFFILIATE, NOR IS ANYTHING IN THIS AGREEMENT TO BE CONSTRUED TO REQUIRE AN AFFILIATE TO INDEMNIFY SUPPLIER, OR TO OTHERWISE ASSUME ANY RESPONSIBILITY FOR THE ACTS OR OMISSIONS OF AERO PRECISION OR ANY OTHER AFFILIATE, UNLESS AERO PRECISION HAS AGREED IN WRITING SIGNED BY AN AUTHORIZED SIGNATORY TO ASSUME SUCH OBLIGATIONS.

1.2 Amfuel will make its best effort to refer all requests to Distributor for prices of aircraft products in the Territories from brokers and/or end users of the products listed herein.

1.3 Amfuel agrees to provide Distributor with such promotional and technical advice, literature, inspection, engineering, and other information which is commercially reasonable for Distributor's marketing and sale of the Products within the Territories. Upon request, Amfuel will provide an authorization letter acknowledging Distributor as its authorized distributor for the requested Territories.

1.4 Distributor represents Amfuel for USG SBSA program.

1.5 Except for any territories reserved to Amfuel in Section 1.8 and in Attachment A, Amfuel agrees that Distributor shall exclusively sell the Products in the Territories to the exclusion of Amfuel and any of its resellers or distributors. In the event that Amfuel sells Products to any third party in the exclusive Territories in violation of the terms of this Agreement or with respect to customer opportunities that the Parties agree that Distributor shall exclusively fulfill the sales, marketing, and distribution of the Products ("each an "Exclusive Sales Opportunity"), Amfuel agrees to pay Distributor a twenty percent (20%) commission fee based on Amfuel's net sales of the Products, which is the gross sales price minus freight and other associated transportation costs. Any commission fees owed or payable pursuant to this Section shall be paid by Amfuel within one (1) month of Amfuel receiving payment from its customer. So long as Distributor is not in breach of its obligations under this Agreement, Amfuel shall not grant any new Party during the term of this Agreement the right to market, distribute, or sell any of the Products in any exclusive Territories, or to fulfill any Exclusive Sales Opportunity.

1.6 During the term of this Agreement and upon prior review with Distributor, Amfuel may engage in any marketing activity for the Products within the exclusive Territories. Opportunities identified during Amfuel generated marketing activities will be reviewed with Distributor's personnel within the defined geography. Distributor reserves the right to assume sole responsibility for the sales opportunity or decline the opportunity based upon Distributor defined criteria. If an opportunity is declined by the Distributor for any reason, Amfuel reserves the right to pursue the opportunity with no additional fees or commission paid to the Distributor.

## 2. General Provisions

2.1 In the course of performing their tasks, as provided in this Agreement, the Parties shall act in a loyal and honest manner towards each other. They shall perform their duties in accordance with sound business practice.

2.2 Distributor will make its best efforts to promote the sale of Amfuel's products in the Territories. Such sales are an essential element of the renewal of this Agreement. However, renewal of this Agreement shall occur only upon the written agreement of both Parties.

2.3 Payment Terms. Distributor shall maintain at all times his account payable to Amfuel within their standard terms, which are net 30 days date of invoice.

2.4 Training. Amfuel shall provide any mutually agreed training for the Products at the mutually agreed locations and times, with each Party bearing its own costs associated with such training.

2.5 Recall. If Amfuel initiates a Product recall or investigation into a Product defect, or if Amfuel receives notice from any governmental authority or from the manufacturer of a component of the Product of a product defect, recall, or investigation, Amfuel will provide immediate and timely written notice of such defect, recall, or investigation to the Distributor.

2.6 Warranty. All Products manufactured and sold by Amfuel are warranted to be free from material defects in materials and workmanship at the time of delivery from Amfuel for a period of twenty-four (24) months from the date of shipment ("Warranty Period"). The exclusive terms, conditions and scope of Amfuel's standard warranty provisions, attached hereto as Attachment B and hereby incorporated by reference as if set forth fully herein ("Warranty"), will apply and control in all instances. In the event of a conflict between the terms of this Agreement and the Warranty, the Warranty will control. Amfuel has the right in its sole discretion to modify its warranty at any time; provided however, no such updates shall apply to any already accepted order(s), and except as otherwise mutually agreed any such modifications shall only apply to any subsequent orders accepted after the effective date of the applicable warranty modification. Any defect not covered under, or excluded by Amfuel's Warranty is excluded from the warranty provided to the Distributor. Upon receipt of Distributor's written notice of Product defect that is covered by the Warranty, AMFUEL shall promptly issue to Distributor a return material authorization number ("RMA") with information on Amfuel's RMA designated Product return facility.

2.7 Product Changes. Whenever parts in stock at Distributor location are (a) rendered obsolete based on Amfuel's modifications, upgrades or design changes , or (b) held in the Distributor's inventory after Amfuel is no longer authorized to manufacture or

provide warranty service for them, , Amfuel will, in its sole discretion, (1) accept return of obsolete components and materials returned during the Warranty Period (currently 2 years) where applicable and in cases where Amfuel is no longer authorized to provide warranty when returned during the Term   for credit equal to the amount paid by the Distributor, inclusive of return shipping and other incidental costs and expenses, or (2) have such components and materials replaced, repaired, modified or upgraded at no cost to the Distributor. Amfuel may discontinue or suspend the sale of any or all of the Products at any time upon providing no less than ninety (90) days' prior written notice to the Distributor. Without being in breach of this Section, Amfuel may discontinue or suspend the sale of any Products immediately as required to comply with any applicable court orders, government contracts, certification expiration/revocation, change in laws or regulations, or for other commercially reasonable reasons.  Amfuel may also suspend immediately the manufacture of the Products to address quality issues in manufacturing. Amfuel shall notify Distributor promptly of any such suspensions.

2.8  Insurance. Each Party shall maintain commercial general liability insurance, including contractual liability insurance, errors and omissions coverage, and products liability insurance against any claims arising out of or related to the performance of such Party pursuant to the terms of  this Agreement, in such amounts as are customary in the industry for similar products and performances.  Each Party shall maintain such insurance during the term of this Agreement and thereafter for so long as it maintains insurance for itself covering such activities.

2.9 Reschedules.  Whenever Amfuel needs to reschedule any Product deliveries   to address quality issues in manufacturing or any other matters,  Amfuel shall promptly notify the Distributor.  The Distributor may requests to cancel or reschedule a purchase order, and Amfuel's standard terms and conditions will apply.

2.10 Books and Audits. Distributor agrees to allow Amfuel to audit its records pertaining to the sale of Products upon at least seventy-two (72) hours advance notification to the Distributor.  Any such audit(s) shall be conducted at Amfuel's sole cost and expense, during normal business hours, and at Distributor's headquarters.  Amfuel agrees to consent to any audit of its books or records by Distributor in connection with the sale of Products to Distributor's customer, but only when required by applicable law or by rule or regulation of the Territories or any customer's national department or agency with proper jurisdiction.  Distributor shall provide Amfuel with no less than two (2) weeks notice of any such audit and shall be responsible for all associated costs.

2.11 Representations and Warranties.

- A. Each Party represents and warrants that it has complied and will comply with all applicable laws and regulations, including without limitation, all licensing requirements, and all export and/or import requirements set forth in the International Traffic in Arms Regulations or otherwise.  In addition, upon reasonable advance written request by Amfuel, Distributor agrees to provide Amfuel reasonable documentation confirming Distributor's compliance with all such laws and regulations with respect to the sale, marketing, or distribution of the Products.

- B. Distributor hereby certifies that Distributor shall comply with all applicable provisions of the US Foreign Corrupt Practices Act of 1977, as amended, the British Bribery

Act 2010, as amended, the Patriot Act, including all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56), as the same may be amended, replaced, supplemented or otherwise modified from time to time, and any analogous legislation of other jurisdictions. Accordingly, Distributor will make no illegal payments to procurement officials for the purpose of obtaining or keeping business, or to a procurement official for the purpose of obtaining or retaining business for or with, or directing business to, any person. Distributor certifies that it has not and will not take any action in furtherance of an unlawful offer, promise, or payment to a public official and will not take any action that would cause Distributor to be in violation of such legislation.

C. Distributor agrees to comply with all export and import regulations to include the Export Administration Act, as amended (the "EAA"), (50 U.S.C. App § 2401-2420), including the anti-boycott and embargo regulations and guidelines issued under the EAA; the International Emergency Economic Powers Act, as amended (50 U.S.C. App § 1701-1707); the Export Administration Regulations Act, as amended (15 C.F.R. Part 730-774); the Arms Export Control Act, as amended (22 U.S.C. App § 2751-2799aa-1); the International Traffic in Arms Regulations, as amended (22 C.F.R. Parts 120-130); the regulations of the Department of the Treasury, Office of Foreign Assets Control, and regulations, procedures and policies of the United States and any countries having jurisdiction over this Agreement, and any other applicable laws and regulations. Distributor shall not export, disclose, furnish or otherwise provide any article, technical data, technology, defense service, or technical assistance of AMFUEL to any foreign person or entity, whether within the U.S. or abroad, without obtaining, in advance, appropriate U.S. government export authorization. Neither Party shall be liable to the other or the other's customers for failure to provide products, services, or transfers of technical data as a result of government actions that impact either Party's ability to obtain import, export or re-export licenses or comply with said import, export or re-export licenses.

D. AMFUEL warrants and represents the following to the DISTRIBUTOR:

1. All Products are supplied with a AMFUEL certificate of conformance (C of C). If a Customer requests any additional certification, the DISTRIBUTOR will notify AMFUEL and AMFUEL will notify the DISTRIBUTOR whether it will agree to provide such certification, and if so, of any cost that would be applicable to supply such requested certification.
2. AMFUEL has not licensed/authorized anyone other than the DISTRIBUTOR to market, sell, or distribute the Products in the Sales Territories from and after the date hereof.
3. The Products are new, free from defects in design, material, and workmanship, meets specifications, and will be free and clear of all liens, security interest, and encumbrances.
4. Should AMFUEL learn of any technical defect or problem with respect to the Products that may give rise to a claim for breach of warranty under this provision then AMFUEL will notify DISTRIBUTOR promptly thereafter. Upon such

notification, AMFUEL and DISTRIBUTOR will enter into discussions and implement measures to correct such technical defects or problems.

E. Both Parties agree to notify the other within ten (10) business days of a Party's awareness that any of the foregoing representations and warranties are no longer valid.

### 3. Prices

3.1 Amfuel shall sell the products specified herein to Distributor at the prices reflected in Attachment "B" hereto, subject to 3.2 below. Price List in Attachment **A** to be submitted by April 1, 2017 and reviewed by API within sixty (60) days. Unless otherwise agreed, all prices set forth on the Price List shall be for the Products packed in accordance with Amfuel's standard packing procedures and delivered free carrier ("FCA,"), with transfer of risk of loss at AMFUEL's place of business, U.S.A (Incoterms, 2010).

3.2 Amfuel will make its best effort to maintain prices on long term orders for one year, and unless expressly prohibited in this Section, reserves the right to change prices with a 120-day notice should any of the following occur:

- Raw materials cost increase more than 7%
- Labor cost increase more than 10 %

Other non-associated cost rise to a point that the Products as sold to Distributor are not profitable for Amfuel. Amfuel will not change Product prices included in an accepted Distributor purchase order if delivery is taken within (i) the Distributor fiscal year of the pricing being used, (ii) three (3) months of the order date for any Amfuel Products in Amfuel stock at the time of order, or (iii) three (3) months of when Products not in stock were manufactured, or as otherwise mutually agreed. Notwithstanding the foregoing, Amfuel will honor all open orders and quotations through sixty (60) days validation based upon its quoted pricing.

### 4. Orders

4.1 Amfuel will process Distributor orders under Amfuel's standard lead times except where the U S government requires first call.

4.2 Should an order need to be expedited outside of normal lead times Amfuel will notify distributor of any increases in associated charges. Amfuel shall notify Distributor within ten (10) days of an order being placed by the Distributor that Amfuel is either unable to timely fulfill the order, or able to fulfill such request, and provide notification of any additional costs that will be assessed to Distributor for expedited orders. No expedited delivery charges shall apply where mutually agreed and Amfuel has expedited the delivery of any shipment due to marketing purposes.

4.3 Unless otherwise agreed to by Amfuel in writing, Amfuel is under no obligation to accept any order for Product.

4.4 All purchase orders placed by Distributor and all invoices provided by Amfuel shall be subject in all respects to the terms of this Agreement, irrespective of whether such terms are incorporated or referenced in such documents. The Parties other pre-printed forms shall have no force and effect unless expressly included in this Agreement.  In the event

of a conflict with a Party's terms outside of this Agreement, and the terms of this Agreement, the terms of this Agreement shall control.

**5 Length of the agreement and Termination**

5.1 This Agreement is valid for three (3) years from the date of signing and can be renewed if the Parties are in Agreement, and the Distributor is current with payments and business is within a mutually agreed annual procurement target or is increasing at the end of the Term.

5.2 Either Party may terminate this Agreement by giving the other Party written notice of no less than an effective termination period of ninety (90) days. Amfuel agrees that any Product on order by the Distributor will be finished and delivered at the agreed ordering price.

5.3 In the event that Amfuel terminates the Agreement for convenience, Amfuel shall, within thirty (30) days of Amfuel's receipt of Distributor list of inventory available for repurchase, repurchase from Distributor at the original Product purchase price all Products that Distributor includes on its inventory repurchase list, and for this return no re-stocking charges or any other fees of Amfuel shall apply. For Products returned under this Section, title and risk of loss shall transfer to Amfuel upon Distributor's delivery of the Products to Amfuel's designated return location.

5.4   If the other Party is in default of any of its material obligations under this Agreement (other than the payment of money, which is dealt with in Section 6.5) and has failed to cure such failure within thirty (30) days of the non-breaching Party's written notice, the non-breaching Party may, at any time and at its election, terminate this Agreement immediately upon written notice to the other Party.

5.5 At any time, a Party may, at its election, terminate this Agreement immediately upon written notice to the defaulting Party in the event of any of the following:

   5.5.1.   The other Party shall fail to make timely payment of any amounts due within thirty (30) days after the date on which such payment hereunder shall become due and payable; or

   5.5.2.   The other Party shall become insolvent or adjudicated bankrupt; or any action shall be taken by either Party, or by others against either Party under any insolvency, bankruptcy or reorganization act, and not fully dismissed within sixty (60) days after the institution thereof; or

   5.5.3 If either Party shall make an assignment for the benefit of creditors, or a receiver shall be appointed for either Party.

5.6   If this Agreement is terminated by Amfuel for default, all obligations of Amfuel to Distributor shall cease and the Distributor, upon Amfuel's request, shall return all Amfuel inventory to Amfuel, which shall be paid by Amfuel at Distributor's original purchase price. If this Agreement is terminated by either Party for convenience under Section 5.2 above, Distributor and Amfuel shall continue to be bound by all obligations hereunder that arose prior to the date of termination, including without limitation, obligations relating to unfilled Distributor Product orders., Except for Amfuel's obligations of warranty, confidentiality, and any payment obligations to the Distributor for any amounts owed to the Distributor and any provisions set forth in Section 5.7, which obligations shall survive the expiration

or termination of this Agreement, Amfuel shall only be obligated with respect to any other Agreement clauses to the extent that Distributor within a month from the termination of the Agreement that it can demonstrate that it has a customer commitment with respect to such Products. Distributor agrees, upon Amfuel's request, to return all remaining uncommitted inventory to Amfuel at Distributor's original purchase price.

5.7 Notwithstanding any terms in this Agreement to the contrary, the following sections of this Agreement shall survive termination or expiration of the Agreement: Sections 1.1.4, 2.6, 3.2 (for any pricing quotation pricing), 3.1 (with respect to any pricing for Products ordered during the Term of this Agreement), 4.1, 4.4, 5.2, 5.3, 5.6, 6, [  ]

## 6 Miscellaneous

6.1 This Agreement is subject to the Standard Terms and Conditions of Amfuel attached hereto. In the event of any conflict between this agreement and the Standard Terms and Conditions attached hereto, the Standard Terms and Conditions shall govern.

6.2 This Agreement cannot be altered or amended without the written consent of both Parties.

6.3 Notice. All notices which are required to be given hereunder shall be deemed to have been duly given when made in writing and shall be effective Seven (7) days after deposit in the United States mail, postage prepaid, certified or registered mail, return receipt requested, or the next day after delivery to a courier for next day delivery service, or immediately if delivered by hand and addressed to the other Party at its address set forth below, in or to such other address as the other Party shall by like notice specify from time to time.

    If to AMFUEL:        American Fuel Cell and Coated Fabrics Company,

                                              8600 North Central Freeway,

                                              Wichita Falls, TX 75305

    If to AERO PRECISION: Aero Precision Industries LLC

201 Lindbergh Avenue

Livermore, CA 94551

Attn: Sr. Director of Supply Chain

Email Cc: Compliance@aeroprecision.com

6.4 Each Party agrees to the Proprietary Information terms set forth on Attachment C and the 6.5 <u>Nonwaiver</u>. No failure by any Party to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver of such right, power or privilege.

6.5 <u>Force Majeure</u>. Neither party shall be responsible for any delay or disruption in performing their obligations (other than the obligation to pay money) if such delay or disruption is caused by force

majeure, including without limitation wars, insurrections, strikes, fires, floods, work stoppages, or earthquakes.

6.6 Governing Law; Exclusive Jurisdiction. The Parties agree that the law of the State of Texas without regards to its conflict of law principles shall govern the interpretation, enforcement and performance of this Agreement. The U.N. Convention on Contracts for the Sale of International Goods is hereby excluded from application to this Agreement. Each Party irrevocably consents to the exclusive jurisdiction of the state or United States federal courts in or around Travis County, Texas in connection with any action to enforce the provisions of this Agreement, to recover damages or other relief for breach or default under this Agreement, to enforce any decision or award of any arbitrators, or otherwise arising under or by reason of this Agreement.

6.7     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Parties and their permitted successors and assigns.

6.8     Severability. In the event that any provision of this Agreement shall be held to be invalid or unenforceable for any reason, it will not affect any other provision of this Agreement and the remaining covenants, restrictions and provisions hereof shall remain in full force and effect.

6.9     No Third-Party Beneficiaries. Except as specifically provided herein, the provisions of this Agreement are intended solely for the benefit of the Parties and shall create no rights or obligations enforceable by any third party, including creditors of the Parties, except as otherwise expressly required by applicable law.

6.10    Interpretation. In the event any claim is made by any Party relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Party or its counsel.

6.11    Entire Agreement; Amendment. This Agreement and the attached Exhibits constitute the entire agreement of the Parties with respect to their subject matter and supersede any and all prior agreements, negotiations, correspondence, understandings and communications of the Parties, whether oral or written, with respect thereto. No provision of this Agreement may be amended, modified, waived or discharged unless in writing signed by the Parties.

6.12    Assignment. This Agreement may not be assigned voluntarily or by operation of law by either Party without the prior written consent of the other Party, provided that the non-assigning Party shall not unreasonably withhold, delay or condition their consent to any such assignment.

6.13    Compliance with Law. Both Parties agree that they will not take any action or use or spend any funds, regardless of source, in violation of the laws of the United States of America or any country or countries within the Territories, including, but not limited to, the payment of bribes, kickbacks, political contributions, or other prohibited payments.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the Effective Date.

AERO PRECISION INDUSTRIES LLC

By: _____
Typed Name: Frank Cowle (President) or Richard Archer (CFO)

Date: 3/14/2017

AMERICAN FUEL CELL & COATED FABRIC CO.

By: _[signature]_
Typed Name: LEONARD J. ANNACURZO
Title:

Date: 3/22/17

Attachment A: Territory

Attachment B: Standard Terms and Conditions of Amfuel

Attachment C: Proprietary Information

Attachment D: Amfuel Trademarks

### ATTACHMENT A: Commercial Terms

**TERRITORIES**

- Distributor represents:

    o  Amfuel Worldwide Exclusively for all Military Platforms Parts and Repair Ordering System (PROS), Simplified Non-Standard Acquisition of Parts (SNAP), Small Business Set Aside (SBSA) programs and any other USG-brokered sales.

    Excluded Territories:

    o  US Government, and USG Foreign Military Sales ("FMS"), Canada F18 Platform, and Japan CH47Platform are not covered under this Agreement.

Distributors may exclusively sell, market, and distribute said Products only to entities with a principal place of business outside of North America; provided however, the following entities are specifically excluded (i.e. Amfuel is not granting Distributor rights to sell, market and distribute, either directly or knowingly through a reseller, to these entities even if they are located outside of North America) regardless of location unless otherwise mutually agreed in writing for particular business opportunities: (A) all direct and indirect sales to the United States Government including, but not limited to, sales to the Department of Defense (including all branches of the U.S. Military) ("DoD"), sales through the Foreign Military Sales Program of the DoD, sales to the Defense Logistic Agency ("DLA"), and sales to all civilian agencies of the United States Government.

**PRICE LIST:**  Amfuel to provide in accordance with the Agreement terms.

## Attachment B: Standard Terms and Conditions of Amfuel

### LIMITED WARRANTY

**AMFUEL WARRANTS THAT ALL NEW PRODUCTS DELIVERED PURSUANT TO THE PURCHASE ORDER WILL BE FREE FROM DEFECTS IN MATERIAL AND WORKMANSHIP THE WARRANTY PERIOD.**

A.  The period of this limited warranty shall begin individually with the date of delivery of the unit/s by Amfuel and subject to Item F below. Repairs subject to Item G of this limited warranty, shall not change or extend the warranty periods provided above.

B.  Amfuel will in no event be liable for consequential or indirect damage, and purchaser's only and exclusive remedy is limited to repair or replacement of the fuel cell or refund of the original purchase price, at the option of Amfuel, and covers solely the original material supplied by Amfuel.

C.  Amfuel's liability is limited to replacement of material f.o.b. point of manufacture and does not include cost of labor, equipment, or other cost incidental to replacement of parts, adjustments or repairs or any other work unless such charges are assumed or authorized by Amfuel.

D.  This warranty does not cover damage or failure resulting from neglect, misuse, abuse, or vandalism, accident, alteration, actions of elements, improper installation, maintenance or repair, acts of God, or other casualty.

E.  Amfuel is not responsible or liable for any cost and/or burden incurred if delivery is delayed for any reason.

F.  Amfuel assumes no liability under this warranty unless purchaser cooperates fully with Amfuel or its designated representative in its investigation and adjustments of all claims and to this end purchaser agrees to notify Amfuel immediately of any failure and to send written confirmation thereof to Amfuel within ten (10) days of Distributor's notice of any failure stating the nature of specific alleged defects or defects complained of.

G.  The alleged defective fuel cell shall be placed at the disposal of Amfuel for inspection at plant of the purchaser, or, at Amfuel's option, may be returned to an Amfuel plant or such other place as Amfuel may designate for testing and/or repair; shipping shall be at the purchaser's expense, until responsibility of defect is determined by Amfuel.

H.  "PURCHASE ORDER" as referred to herein refers to the approved customer order for the product produced and all terms it contains and nothing outside the purchase order, including the trade name of the product, shall warrant the product to specific performance standards or that the product is designed for any specific usage or containment not stated on the face of the purchase order.

I.  There are no warranties, either express or implied which extend beyond the warranty stated above, including warranties of merchantability or fitness.

J.  No person or representative is authorized to extend any warranty or to assume any liability beyond that which is contained herein.

Quoted prices and orders shall be subject to the following Terms and Conditions.

### I- APPLICATION

By the very fact of placing an order, the Buyer acknowledges having taken cognizance and accepted these delivery terms

Any provisions inconsistent herewith that are stipulated by the Buyer or appear on the Buyer's business documents shall be valid only if accepted beforehand by AMFUEL in the form of written contract signed by the Buyer and AMFUEL.

### II -PRICES

Unless specifically stated as included in the price quoted, there shall be added to the price all Federal, State,

Municipal, or other governmental taxes, duties, or other charges which AMFUEL is required to pay or

collect incidental to the manufacture, sale, or storage of the product ordered.

Unless otherwise agreed between the Parties, prices are understood to be ex-works (ICC90) or FOB Origin.

### III- DELIVERY AND ACCEPTANCE

Our delivery dates are in all cases stated as a guidance line only, they do not take into account

unforeseeable circumstances or cases of force major or due to fluctuating market demand.

We shall not be held liable for any losses or damages caused by any delay in delivery.

Any late payment by the Buyer may lead to the temporary suspension or definitive discontinuance of our shipments. In the event of customer's unacceptable delay in issuing shipping instructions or releases, customer shall reimburse AMFUEL for all or inventory expenses incurred by reason of such delay. Acceptance of this order and the release of any shipment thereunder shall at all time be subject to AMFUEL's sole judgement after obtaining such credit information as customer may supply or otherwise make available.

### IV -TRANSFER OF OWNERSHIP AND OF RISK

Transfer of risks occurs as of the moment the forwarding agent has loaded the goods at the place of loading

in our plant unless otherwise agreed between the Parties.

Transfer of ownership shall occur only after the Buyer has discharged all its obligations towards AMFUEL.

### V -EQUIPMENT SUBMIT TO SPECIAL LEGAL OBLIGATIONS

All export orders for military aircraft fuel cell are subject to receipt of an export license by AMFUEL

issued by the US State Department, Office of Defence Trade Controls.

### VI CANCELLATION

Cancellations will be effective only with the specific agreement of AMFUEL sales manager. Depending upon the circumstances of cancellation, a charge may be quoted for acceptance.

### VII - CLAIMS

Once a shipment has been received, the Buyer undertakes to immediately perform all necessary checks in view of presenting any claims for improper or defective deliveries.

In the case of products manufactured, packaged, or labeled in accordance with customer's design or

specifications, or which employ materials or customer's designation, customer will save harmless and indemnity AMFUEL from any judgment, claim, cause of action, loss or other expense, including legal fees and expenses, caused or otherwise arising out of the actual or alleged infringement of any patent, trademark, or suit of unfair competition.

VIII - RETURN OF GOODS

Except for valid warranty returns, customers should not return without prior authorization from the appropriate sales department. Any unauthorized return shall be made at the Buyer's risk and expense, including storage charges for goods in a warehouse of our choice.

### ATTACHMENT C PROPRIETARY INFORMATION

A. Each Party acknowledges that the performance of this Agreement may involve the disclosure by one Party to the other Party of the disclosing Party's confidential, trade secret or proprietary information ("Protected Information"). During the term of this Agreement, and for an additional period of twenty (20) years thereafter, each receiving Party shall (1) regard and preserve as confidential all Protected Information of the disclosing Party obtained by the receiving Party from whatever source, (2) disclose such Protected Information only to those of its representatives who need to know such information for the purpose of discharging its obligations under this Agreement, (3) use, and cause its representatives to use, Protected Information solely for the purpose of discharging its obligations under this Agreement, and for no other purpose, (4) at its sole expense, take all reasonable measures to prevent the unauthorized use or disclosure by its representatives of Protected Information, and (5) refrain, and cause its representatives to refrain, from using Protected Information in any way detrimental to the disclosing Party or its affiliates. Nothing herein is intended to limit or abridge the protection of trade secrets under applicable trade secrets law, and trade secrets shall be maintained as such until they fall in the public domain. Upon expiration of the Term, each receiving Party shall, at its sole expense, promptly return to the disclosing Party or destroy (which destruction shall be certified by the receiving Party) all copies of Protected Information in its possession or under its control or the control of its representatives.

B. Protected Information shall not include (1) information that the receiving Party can show by written evidence that it knew and held without restriction as to further use or disclosure before the disclosing Party disclosed the information under this Agreement, (2) information that is developed by the receiving Party independently of the disclosing Party, (3) information that an unrelated third party lawfully, and not in violation of any contractual, legal or fiduciary obligation to the disclosing Party, disclosed to the receiving Party, the further use or disclosure of which is not restricted, and (4) information that is or becomes generally available to the public other than as a result of any action taken by the receiving Party. Protected Information shall include any confidential, protected or proprietary information disclosed by a disclosing Party, as well as any derivative thereof, in any form. Protected Information shall be labeled as such upon disclosure, but any failure to so label Protected Information by a disclosing Party will not relieve a receiving Party from the obligations related to Protected Information set forth herein, provided that the receiving Party knows, or should reasonably know, that such information is confidential, protected or proprietary in nature.

C. Should any person seek legally to compel (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or otherwise) any receiving Party to disclose any Protected Information, the receiving Party shall provide the disclosing Party with prompt written notice so that disclosing Party may seek a protective order or other appropriate remedy (including by participating in any applicable proceeding) and/or waive compliance with the terms of this Agreement. In any event, the receiving Party shall cooperate reasonably with the disclosing Party to preclude disclosure, shall furnish only that portion of the Protected Information which it is legally required to disclose, and shall exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded such Protected Information.

D. In addition to any and all such other remedies, the Parties agree that this Attachment C may be enforceable by injunctive proceeding. The Parties acknowledge and agree that the disclosing Party may be irreparably injured in its business and may not have an adequate remedy at law if a receiving Party were to breach or threaten to breach the provisions of this Attachment C. Accordingly, in the event of a breach or attempted breach of this Attachment C of this Agreement, the disclosing Party shall, in addition to other rights and remedies, be entitled to seek immediate, appropriate injunctive relief temporarily, preliminarily, and permanently restraining receiving Party from any threatened or actual breach of the covenants and obligations contained in this Attachment C, and with respect to temporary injunctive relief (i.e. preliminary injunction, temporary restraining order, etc.) without the necessity of showing any irreparable injury or special damages and without a requirement to post any bond. Notwithstanding the anything in this Agreement (including its exhibits) to the contrary, no ex parte relief shall be sought for any equitable or legal remedy available hereunder, excluding any motions for default attributable to a Party not appearing in accordance with any court summons issued in compliance with applicable service of process requirements.

E.  This Article will survive termination of this Agreement for the period of confidentiality applicable to the Protected Information expressly set forth in this Attachment C.

## ATTACHMENT D
## AMFUEL TRADEMARKS

## TRADEMARKS & TRADE NAMES

**Amfuel Trademarks:**

Amfuel hereby grants to Distributor, and Distributor hereby accepts from Amfuel, a non-transferable and nonexclusive, royalty free, right and license to use the Amfuel trade names, service marks and trademarks (collectively, the "AMFUEL Trademarks"), for the sole purpose of, and as necessary for, the marketing, sale, and distribution of the Products in the Sales Territories. Distributor shall not grant to any third party during the term of this Agreement the right and license to use the AMFUEL Trademarks in the Sales Territories. At no time during or after the Term of this Agreement shall Distributor challenge or assist others to challenge AMFUEL's Trademarks or the registration thereof or attempt to register any trademarks, marks or trade names confusingly similar to those of Company. This obligation will survive the termination of this Agreement.

All advertising that uses AMFUEL's Trademarks (other than solely using the trade names "Amfuel" in telephone, address, contact or product listings) that Distributor intends to use shall first be submitted to Amfuel for approval (which shall not be unreasonably withheld) of design, color, and other details, and Distributor shall comply with Amfuel's then-current branding guidelines, as applicable.

All of Amfuel's designs, drawings, formulas or other data, sales or pricing information, business or marketing plans, photographs, demonstrators, literature, and sales aids of every kind shall remain the property of Amfuel. Within fourteen (14) days after the termination of this Agreement, Distributor shall return all such items to the Amfuel at Distributor's expense, or certify its destruction of such items. Distributor shall not make or retain any copies of any confidential items or information that may have been entrusted to it. Effective upon the termination of this Agreement, or at the direction of Amfuel, Distributor shall cease to use all trademarks, marks and trade name of Amfuel. In the event this Agreement is terminated or has expired and Amfuel has requested Distributor continue to market, distribute, and/or resale the Products, no remedy is permitted against Distributor's for its use of any of AMFUEL'S Trademarks in accordance with AMFUEL then-current branding guidelines that have been provided to Distributor during the duration of (i) any definitive renewal agreement negotiation period, or (ii) six (6) months from the date of expiration or termination of this Agreement, provided Amfuel has granted in writing to Distributor, the right to continue to use AMFUEL's Trademarks and other marketing materials. In all other instances where Distributor has not been granted such written authorization, Distributor agrees that the use of any trademarks, marks and trade name, or any other reference to Amfuel after the termination of this Agreement, or after Amfuel has indicated to stop use, may result in irreparable harm to Amfuel for which monetary damages is not sufficient and that AMFUEL will be entitled to seek equitable relief, and with respect to temporary injunctive relief (i.e. preliminary injunction, temporary restraining order, etc.) without the necessity of showing any special damages and without a requirement to post any bond. All equitable relief contemplated herein will be without prejudice and in addition to any other rights or remedies the Amfuel may have.